**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**                                                    **Criminal Action No.: 2:18-CR-30
JUDGE BAILEY**

**ROBERT JUNKINS,**

**Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT DEFENDANT'S
MOTION TO SUPPRESS BE DENIED**

This matter is before the undersigned pursuant to a Motion to Suppress filed by Defendant, by and through counsel, on January 31, 2019. (ECF No. 28). This matter is now ripe for a report and recommendation to the Honorable John Preston Bailey. Accordingly, the undersigned **RECOMMENDS** that the Motion be **DENIED** for the foregoing reasons.

I.      **PROCEDURAL BACKGROUND**

a.  **Motion to Suppress**

On January 31, 2019, Defendant, by and through counsel, filed a Motion to Suppress Evidence seeking the suppression of evidence of two incidents—September 1, 2017 and November 30, 2018.[1] As to the September 1, 2017 incident, Defendant argued that his detention waiting for a K9 dog sniff was unreasonable and that Defendant was subject to questioning following this detention in which defendant allegedly made incriminating statements. Defendant

---

[1] A third request for suppression of evidence was stemming from a third incident on September 20, 2017. Following the filing of the Motion, the Government moved to dismiss Counts Six and Seven of the Indictment, which if granted would render that portion of the Motion moot. On February 13, 2019, Judge Bailey granted the Motion and dismissed those counts, rendering the argument as to Counts Six and Seven in the Motion moot. Accordingly, the undersigned does not address the argument for suppression as to Counts Six and Seven.

argued that these statements were fruit of an illegal traffic stop and should be suppressed as a result.

On November 30, 2018, Defendant argued that the search of Defendant's vehicle was illegal and beyond of the scope of the stop. According to the Motion, law enforcement pulled behind Defendant's vehicle that was legally parked in a parking space at the Go-Mart in Elkins, West Virginia and was turned off and stationary. According to the Motion, the officers approached the vehicle to issue a citation for an expired license plate and subsequently conducted a search, well beyond the scope of the stop, because officers viewed alleged drug paraphernalia on the floor of the vehicle. Following Defendants arrest as a result of the search, Defendant made alleged incriminating statements that Defendant is arguing is fruit of an illegal search.

### b.  Government's Response

On February 8, 2019, the Government filed its Response. (ECF No. 34). The Government argues that the August 1, 2017, traffic stop was initiated following two violations—littering and obstruction of a license plate—which created probable cause that Defendant committed a traffic infraction. Furthermore, the Government argued that the dog sniff occurred during the traffic stop and the stop was not unreasonably extended for the dog sniff but that officers were still executing the traffic stop when the dog sniff occurred. The Government further argued that the November 30, 2018 traffic stop was supported by probable cause because of the expired license plate on a vehicle that was parked in a parking spot immediately off the main road with its engine still running, indicating to the officers that the vehicle had traveled to the parking lot. The Government argued there was probable cause to initiate a traffic stop and once Defendant was asked to exit the vehicle, drug paraphernalia was seen in the vehicle which gave officers

probable cause to search the vehicle. The Government added from there, the items found during the search and any statements made following were not fruits of an illegal seizure and should not be suppressed.

### c.   The Testimony

#### i.   <u>August 1, 2017</u>

The Government called Shinnston Police Chief Jason Carlson to testify regarding the August 1, 2017 traffic stop. (February 11, 2019 Motion Hearing Recording, Time: 11:05 a.m.)[2]. Chief Carlson testified that he received notice of a complaint regarding two individuals, located in a vehicle parked at McDonald's, who were passed out, who had woken up, and were taking pictures. (11:05). The Complainant identified the individuals to be driving a red Ford Mustang. (11:05). Chief Carlson testified that he was dispatched, along with Deputy Chief Goad, to the McDonald's for a welfare check and arrived approximately five minutes later. (11:06). Chief Carlson stated that he drove around the building but was unable to find the red Mustang that the complainant had described. (11:06). Upon fully driving around the building, Chief Carlson testified that he saw the red Mustang pull out of the parking lot and travel North on Route 19. (11:07).

Chief Carlson testified that he followed the vehicle and stated that he saw something white (presumably a straw wrapper) come out of the passenger's side window. (11:08). Chief Carlson also testified that there was a piece of what he believed to be metal obstructing a portion of the license plate and he could not make out all of the characters of the license plate. (11:08). Chief Carlson testified that he initiated a traffic stop and conveyed the unobstructed characters of the license plate to dispatch in order to run the license plate. (11:09). Chief Carlson testified that

---

[2] This citation is shortened throughout.

he approached the driver's side and advised the driver (hereinafter "Defendant") of why the traffic stop was initiated—for littering and the obstructed license plate. (11:09).[3]

Chief Carlson testified that at this time the driver became belligerent and animated and kept slapping his hands against the steering wheel and stated that he did not litter. (11:10). After a request for Defendant's information, Defendant Junkins gave Chief Carlson his driver's license, a temporary registration card, and document that detailed a transfer of registration plates, but stated he did not have his proof of insurance on him. (11:12). Chief Carlson stated that he told Defendant Junkins that he could tow his car for not having a valid proof of insurance, but if Defendant could provide him with an older card, he could then use it to call and verify the insurance. (11:12). Defendant Junkins said that he could call his wife and get a picture of the card. (11:12). Chief Carlson said that this was fine and that he could call and verify the insurance once he had that information. (11:16).

Chief Carlson stated that he went to return to his car to run the full registration and noticed that Defendant's inspection sticker was expired. (11:17). When questioned, Defendant Junkins stated that he was on his way to get his vehicle inspected. (11:17). Chief Carlson stated that he then ran the full license plate, which came back "not on file." (11:19). Chief Carlson testified that this process usually takes approximately 3 minutes, but could take longer depending on how busy dispatch was that day. (11:19). Chief Carlson stated that because the vehicle's license plate came back "not on file," he then ran the vin number of the vehicle and was advised that the license plate was valid. (11:19-20).

---

[3] Chief Carlson testified that in addition to the litter and obstructed license plate, the reasoning for the stop also included checking the welfare of the driver. Defense Counsel goes in to further detail during cross-examination and Chief Carlson reversed what he previously testified and stated that the reason for the stop included only the litter and obstruction of the license plate. Chief Carlson clarified this upon cross-examination that upon pulling up to the vehicle, he was able to check the welfare of the driver. The undersigned is aware of this inconsistency and took it into consideration during the analysis.

Chief Carlson stated that he then returned to Defendant's vehicle and explained to Defendant that a complaint was filed regarding individuals passed out in a red Mustang. (11:22). Chief Carlson testified that Defendant stated that that did not occur and was agitated (11:22). Chief Carlson stated that he asked if he could search the vehicle and stated that Defendant Junkins ignored the requests. (11:23). Chief Carlson went back to his vehicle and requested a K-9 Unit. (11:24). Chief Carlson still had not received the proof of insurance. (11:23). Several minutes later, Defendant Junkins signaled to officers that he had the insurance information. (11:24). The information that was provided was for an Econoline van; Chief Carlson stated that because the insurance was for a different vehicle than the vehicle being driven, he would have to call and verify the insurance. (11:26). See ECF 36-5 (a screenshot of the insurance card for an Econoline van). Chief Carlson called Defendant Junkins's insurance company to verify his insurance. (11:26).

While Chief Carlson was on the phone, which he described as a lengthy telephone call, the K-9 Unit showed up. (11:28). During the dog sniff, the K-9 alerted on the driver's side door. (11:29). Chief Carlson stated that during the dog sniff, he confirmed the proof of insurance and began writing citations, but was not done writing citations at that time. (11:31). Upon opening the door, Chief Carlson testified that Officers Lawless and Goad found a black zip up bag containing narcotics. (11:31). Once narcotics were discovered Chief Carlson stated that he stopped writing citations because he could no longer write a citation through the city as a result of this search. (11:32).

A further search of the vehicle rendered a stolen firearm and drug paraphernalia. (11:32). Chief Carlson also testified regarding the CAD sheets, Government's Exhibits 6 and 7. (11:39) (ECF No. 36-6,7). Chief Carlson explained that Exhibit 6 contains a call log which states that the

call to dispatch occurred at 2:52 p.m. which was for the original complaint regarding two individuals passed out in a vehicle, the officers arrived at the McDonald's at 2:58 p.m., and notified dispatch at 2:59 p.m. that they could not see the vehicle. (11:41-42). Government's Exhibit 7 indicates that at 2:59 p.m. the officers saw the vehicle  and initiated the traffic stop, and the K-9 Unit was *en route* approximately 16 minutes later. (11:43-44). Chief Carlson testified that the K-9 Unit arrived at 3:29 p.m. (11:44).

Upon cross-examination, Chief Carlson testified that he did not stop the red mustang for a welfare check, but rather for the littering and obstructed registration. (11:47-49). Chief Carlson further stated that he did not believe that he needed to see someone throw the trash out the window, nor did he see anyone throw trash out of the window, in order for the infraction to qualify as litter, in regard to Defense Counsel's questioning regarding strict liability. (11:49-50). Chief Carlson also testified that he would not have pulled over the red mustang but for the two infractions.  (11:52).

Shinnston Police Officer Lee Goad testified that at the time of the traffic stop, he was the Deputy Chief of Police, and had worked as a law enforcement officer for approximately nine years. (12:03 p.m.). Deputy Chief Goad testified that he reported to McDonalds following a complaint that a male and female passenger that were passed out in a red Mustang. (12:03). Deputy Chief Goad testified that after seeing the red mustang pull out of the McDonald's parking lot, he and Chief Carlson began to follow the red Mustang. (12:04). Deputy Chief Goad testified that while following the vehicle, he noticed a straw wrapper fly out of the window. (12:04). The officers also noticed that there was a piece of metal obstructing the license plate (12:05).

After following the red mustang, Deputy Chief Goad testified that a traffic stop was initiated based on littering and an obstructed license plate. (12:06). Deputy Chief Goad stated that he approached the passenger side where a female was seated. (12:06-08). Deputy Chief Goad testified that Chief Carlson requested Defendant's driver's license, registration, and proof of insurance. (12:08). Defendant Junkins said he had valid insurance, but his wife had the insurance card. (12:09). Deputy Chief Goad testified that both officers returned to the vehicle to run the registration. (12:09). Deputy Chief Goad returned to Defendant's vehicle to inquire whether he had a smart phone and could get the insurance information. (12:11).

Upon being provided with insurance information, Deputy Chief Goad testified that Chief Carlson then called to confirm his insurance coverage, which was a very long telephone call. (12:14). Deputy Chief Goad testified that a K-9 Unit was requested when Chief Carlson was on the phone inquiring about the insurance. Deputy Chief Goad testified that when the K-9 Unit arrived, Chief Carlson was still on the phone inquiring about the insurance. (12:15). Upon the K-9 Unit's arrival, Deputy Chief Goad testified that he approached the K-9 Unit and explained the circumstances for the traffic stop. (12:16). Deputy Chief Goad testified that the K-9 Unit initiated a dog sniff and alerted on the driver's side, just past the driver's side door. (12:18). Deputy Chief Goad testified that Chief Carlson was still attempting to verify the insurance on the phone, to his knowledge, and writing citations. (12:18). Deputy Chief Goad testified that he was told about the verification of the insurance while the dog sniff was occurring. (12:19). Following the dog's alert, Deputy Chief Goad testified that narcotic items were found immediately within the vehicle. (12:21).

Upon cross-examination, Defense Counsel questioned Deputy Chief Goad regarding Exhibit 6, Paragraph 6 on Page 1. (ECF No. 35-13). Following the return of Deputy Chief Goad

from Defendant Junkins's vehicle with the insurance vehicle information, Paragraph 6 states that the insurance information verification then occurred. Deputy Chief Goad testified that the verification did not happen immediately, and actually occurred during the dog sniff. (12:27). He did concede that the Report does seem to indicate that the verification occurred immediately and prior to the dog sniff. (12:28).

    **b. <u>November 30 Traffic Stop</u>**

The Government called Patrolmen Sayre to testify regarding his involvement in the November 30 traffic stop. Patrolmen Sayre testified that he had been working with the Elkins Police Department since 2015 and this had been his only law enforcement experience post-basic training. (9:37 a.m.). Patrolmen Sayre testified that he does receive annual training and is current in his certification. (9:38). He testified that at approximately 6:00 a.m. on November 30, 2018, he and Officer Summerfield were traveling in his vehicle and were patrolling the area. (9:38-9:39). Patrolmen Sayre testified that he observed a black mercury parked in a Go-Mart parking spot at the front of the store but on the right side of the building. (9:40). He stated that he observed a male was standing outside the vehicle and leaning inside the driver's side window. (9:40).

The vehicle was parked, if looking at the store, on the right side but in front of the store, in a parking spot. (9:42). Patrolmen Sayre testified that he noticed that the car's registration was expired because the color of the sticker located on the license plate and the first number on the license plate—expiring in June 1, 2018.  (9:40-41). Patrolman Sayre testified that as he drove by the vehicle, he ran the tag and was given confirmation that the vehicle tag was expired. (9:43). As he drove by, a store clerk, who was standing outside, pointed at the black mercury. (9:43). Patrolman Sayre testified that he "doubled back" and parked behind the black mercury. (9:43).

By this time, the male that was leaning in the window had gone inside the store. (9:44). Patrolman Sayre testified that he and Officer Summerfield exited their patrol car and approached the black mercury, whose engine was still on, and the male was no longer at the window. (9:44).

Patrolman Sayre testified that he noticed erratic movements, the individuals (male driver, later identified as Defendant Junkins (10:03) and a female passenger) inside the vehicle turned around in their seats to look at the policemen, and leaned forward and reached to the floorboards. (9:45-46). Patrolman Sayre testified that both he and Officer Summerfield identified themselves as officers and requested Defendant identify himself—he stated his name was "Mickey" but did not have his wallet.[4] (9:46-47). Patrolman Sayre testified that Defendant was nervous, frantic, and was shuffling around trying to find his identification card. (9:48). Patrolman Sayre testified that he requested that Defendant to exit the vehicle, due to the behaviors he was exhibiting, and he explained to the Defendant why the he was being stopped. (9:49). Patrolman Sayre testified that he observed a syringe and a smoking device on the floorboard of the driver's seat as Defendant exited the vehicle. (9:49). Patrolman Sayre patted Defendant down and found a large sum of cash in the Defendant's front right pocket and placed it on top of the black mercury. (9:49).

Patrolman Sayre testified that he asked Defendant regarding the items that he had seen in the vehicle, but Defendant Junkins said that there nothing was in the vehicle and became irate. (9:50). At this time, Defendant Junkins grabbed the large sum of cash and put it back in his pockets. (9:50). Patrolman Sayre attempted to detain Defendant Junkins for "officer safety," based on his actions and aggression towards officers, and asked Defendant Junkins to place his hands behind his back. (9:51). Patrolman Sayre testified that Defendant Junkins grabbed a hold

---

[4] The Driver was eventually identified as Defendant Robert Junkins. Although chronologically in the officer's testimony, the driver had not been identified as Defendant Junkins. For clarity of the record, the undersigned refers to the driver as Mr. Junkins for the remainder of the testimony regarding the November 20, 2018 traffic stop testimony.

on the windshield wiper so the officers would have difficulty getting Defendant Junkins's hands behind his back.  (9:51). At this time, a third officer arrived at the scene, and Patrolman Junkins administered OC spray (pepper spray) to gain control of Defendant Junkins. (9:52).

Following the use of the OC spray, Defendant Junkins was compliant and Patrolman Sayre was able to place Defendant Junkins in to a police cruiser. (9:52-53). Patrolman Sayre testified that at that time, they removed the female passenger and detained her with no issues. (9:53). Patrolman Sayre testified that following the detention of Defendant Junkins and the female passenger, he began searching the vehicle based on the syringe and smoking device that Patrolman Sayre testified that he saw upon Defendant Junkins's exit of the vehicle. (9:55). Patrolman Sayre searched the driver's side and found a syringe, a smoking device, and a firearm. (9:55-56). Patrolman Sayre also testified that clear plastic sandwich sized baggies and scales were found in the vehicle (9:57), along with a backpack containing Defendant Junkins's ID and a tube. (9:57).

Patrolman Sayre also testified that a bag of crystal methamphetamine was found located under the front passenger's seat (9:59), along with $723.00 in United States currency, located in Defendant's pocket. (9:59). Patrolman Sayre testified that he found a cylinder-like necklace was around Defendant Junkins's neck and contained a crystal-like substance. (9:58).[5] [6] Patrolman Sayre testified that he exited his vehicle at 6:12 a.m., according to the CAD sheet (ECF No. 36-1), and the OC spray was used at 6:14 a.m. (10:07-08). Patrolman Sayre testified that during the initiation of the stop, he was unable to even check the information provided. (10:08).

---

[5] Patrolman Sayre testified that through his experience as a police officer, he believed this substance to be methamphetamine. (10:00).
[6] Following the discussion of the search of the vehicle, Patrolman Sayre testified regarding the encounter with the male that was previously leaning in to the vehicle. The undersigned is not summarizing this testimony as further interactions with this individual have no relevance to the undersigned's review of the validity of the stop because this encounter occurred following the search of the vehicle.

On cross-examination, Patrolman Sayre testified that his patrol vehicle's lights were not on when he pulled in behind Defendant Junkins's car (10:08), which was parked approximately ten to fifteen feet from the mercury. (10:00). Patrolman Sayre testified that he believed Defendant Junkins was able to back his vehicle up to leave but could not drive forward. (10:00). Patrolman Sayre testified that the store clerk told him that the vehicle had been parked in the Go-Mart parking lot for one hour and that he believe the vehicle to have been running all that time. (10:13).

Upon questioning from Defense Counsel, Patrolman Sayre stated that he patted Defendant Junkins down for weapons and could not tell if the folded cash in Defendant's pockets was a weapon and only felt something hard in Defendant's pocket, but nothing sharp. (10:14). Patrolman Sayre testified that he is not always able to tell whether money folded in such a way is a weapon and has found weapons in a similar form in the past and stated, "I don't want to get poked by a needle."(10:24). Defense Counsel also questioned Patrolman Sayre regarding difference between the description of the running vehicle in Defense Exhibits 1 and 2. (10:10). Patrolman Sayre stated that he drafted Exhibit 1 as a "rough draft" and had other officers go over the draft prior to the production of Exhibit 2, which contained the added language that the vehicle was "running." (10:12-13).

The Government also called Officer Summerfield as a witness who testified that on November 30, 2018, he worked the 6:00 a.m. to 2:00 p.m. shift. (10:30). Officer Summerfield testified that Patrolman Sayre noticed a vehicle that had an expired registration due to the color of the stick on the license plate and the first number on the license plate. (10:31). Officer Summerfield testified that he and Patrolman Sayre circled around the block and initiated a traffic stop, in which they both exited their vehicle and approached a black mercury. (10:32). Officer

Summerfield testified that the registration was confirmed to be expired. (10:32). Officer Summerfield testified that prior to approaching the vehicle, he noticed the two occupants leaning forward. (10:32).

Officer Summerfield testified that the encounter was a traffic stop and the patrol vehicle was parked so that the black mercury could not exit the parking lot. (10:34). Officer Summerfield testified that there was only one exit/entrance to the Go-Mart. (10:35). Officer Summerfield testified that he approached the front passenger side of the vehicle to where, a later identified, Carly Gregory was seated. (10:36). Officer Summerfield stated that there were artificial lights in the area but used his flashlight to assist him in "watching hands" inside the vehicle. (10:33-10:35).

Officer Summerfield stated that he stayed on the passenger side until Defendant Junkins became irate and latched on to the hood of the car. (10:37). Officer Summerfield moved over to the driver's side of the vehicle when Defendant grabbed the cash off the car and Patrolman Sayre pepper sprayed Defendant Junkins. (10:38). Officer Summerfield testified that a large sum of cash, methamphetamine and a blue smoking device were recovered upon the search of the vehicle, but did not personally see these items until after all parties were detained. (10:40). Officer Summerfield also found a quantity of crystal like substance behind the passenger's seat in a medium-sized baggie, a blue smoking device on the floor board, and a needle on the driver's side. (10:40-10:41).

## II.    ANALYSIS

### A.  November 30, 2018 Seizure

Defendant first challenges the seizure during the November 30, 2018 encounter. For the foregoing reasons, the undersigned finds that Defendant was seized during the November 30,

2018 encounter pursuant to a traffic stop based on probable cause and the stop was not unlawfully extended except upon the existence of drug paraphernalia in plain view.

### i.   The stop was a seizure pursuant to a traffic stop.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable . . . seizures." U.S. Const. amend. IV. However, this guarantee does not extend to all police-citizen encounters. Rather, as the United States Supreme Court has instructed, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968). If "a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual." Id. For example, police officers are able to approach individuals and ask questions without having seized said individual. Florida v. Bostick, 501 U.S. 429 (1991). If an encounter is consensual, no reasonable suspicion is required. Id. Until an encounter "loses its consensual nature," Fourth Amendment scrutiny will not apply to any encounter. During traffic stops, for instance, an individual is deemed "seized," even if only for a brief time and for a limited purpose. Whren v. United States, 517 U.S. 806 (1996). However, sometimes whether a seizure occurred is not so readily determinable.

"[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Bostick, 501 U.S. at 439. The Fourth Circuit has followed the standard set forth in United States v. Mendenhall, 446 U.S. 544 (1980) (plurality op.), asking "whether 'in view of all [of] the circumstances surrounding the

incident, a reasonable person would have believed that he was not free to leave.'" United States v. Gray, 883 F.2d 320, 322 (4th Cir. 1989) (quoting Mendenhall, 446 U.S. at 554 (plurality op.)).

This "reasonable person" standard "is an objective one," thus "its proper application is a question of law." United States v. Weaver, 282 F.3d 302, 309 (4th Cir. 2002) (quoting United States v. Sullivan, 138 F.3d 126, 133 (4th Cir. 1998)). A court considers a number of factors in determining whether an officer's conduct would convey to a reasonable person that he is not free to leave. *See* United States v. Jones, 678 F.3d 293 (4th Cir. 2012). These factors "include, but are not limited to, the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or restrain his movement, whether the officers' questioning was non-threatening, and whether they treated the defendant as though they suspected him of 'illegal activity rather than treating the encounter 'routine' in nature.'" Jones, 678 F.3d at 299-300 (quoting Gray, 883 F.2d at 322-23).

With these governing principles in mind, the Court considers the "totality of the circumstances" to analyze the initial encounter. See Jones, 678 F.3d at 300. While neither party argued that this stop was not a seizure, the undersigned, regardless, examines whether the stop began as a consensual encounter, a traffic stop based on probable cause that a traffic violation occurred, or an investigatory stop based upon reasonable articulable suspicion that criminal activity was occurring. This encounter with police officers is a unique one. While the vehicle was running with the driver in the driver's seat, the vehicle was also stopped and legally parked in a parking spot. Notably, there was only one entrance/exit to the parking lot, connecting to a major road, and while the Go-Mart is private property, it is located in the middle of "downtown" Elkins, West Virginia. This encounter does not neatly qualify as a run-of-the-mill "routine"

traffic stop (usually a police officer stopping a moving vehicle on the road). The stop also does not neatly qualify as investigatory stop based on the officer's initially exiting the vehicle to cite Defendant for a civil traffic infraction rather than suspected criminal activity. The stop's circumstances contain aspects of both. The undersigned finds this distinction particularly important when considering Defendant's argument: can an alleged civil traffic infraction that officers did not witness be considered in the reasonable articulable suspicion analysis if an investigatory stop occurred, or in the alternative, whether that same alleged traffic violation could provide the probable cause when officers can only infer that the traffic violation occurred.

The undersigned finds that the officer's conduct indicated to Defendant Junkins that he was not free to leave following the officer's approach of the car--disqualifying this encounter as consensual. The officers first enter the parking lot of the Go-Mart and drive past the vehicle. The officers then drive around the parking lot, "circling back," and park behind the vehicle. The undersigned notes that Patrolman Sayre testified that the police vehicle was not blocking Defendant Junkins's vehicle while Officer Summerfield testified that the police officer's vehicle was blocking the Defendant's vehicle and it was unable to move. Furthermore, upon approaching the vehicle, Patrolman Sayre verbally instructed Defendant Junkins that he was being stopped for the outdated registration tag on his vehicle. If there was any question regarding whether a traffic stop had occurred at this time, it is certainly demonstrated that Defendant Junkins submitted to the authority of Patrolman Sayre and Officer Summerfield and was seized. Defendant Junkins did not attempt to leave, complied by answering questions presented by the officers, and exited the vehicle when Patrolman Sayre requested he do so. Accordingly, the undersigned finds that Defendant Junkins was seized.

The reason the officer's stopped and approached the vehicle is based on the expired registration plate. While the officers testified that they witnessed a man leaning in the window and speaking with Defendant and the store clerk motioned at the vehicle, these suspicious behaviors occurred after the officers had first driven passed Defendant's vehicle and was running his license plate to confirm their belief that the registration plate was expired. The officers approached the car and explained to Defendant that he was being stopped as a result of the expired registration plate.  Accordingly, the undersigned finds that the seizure was initially made pursuant to a traffic stop and any other suspicious behavior only constituted justification for further investigation. Because the traffic stop occurred, there needs to be sufficient justification for the initiation of the stop.

### ii.  There was probable cause to initiate a traffic stop justifying the stop at its inception.

The "[t]emporary detention of individuals during [a] stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure." Whren v. United States, 517 U.S. 806, 809 (1996). Because an individual is seized during any traffic stop, the traffic stop must then be reasonable under the circumstances. Id. at 810. Thus, the consideration of the "dual inquiry," introduced in Terry v. Ohio, "governs the legality of police conduct in routine traffic stops." United States v. Harvey, 901 F. Supp. 2d 681 (N.D.W. Va. 2012). To survive "judicial scrutiny," the traffic stop must first be "justified at its inception," and, second, "sufficiently limited in scope and duration." Id. at 686. Generally, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. Id. While an officer witnessing a traffic infraction occur provides probable cause, United States v. Hason El, 5. F.3d 726 (4th. Cir. 1993), the undersigned has not discovered any

mandatory source that says probable cause cannot be provided absent the officer's witnessing the infraction.

The specific statute states:

Every motor vehicle, *when driven or moved upon a highway*, is subject to the registration and certificate of title provisions of this chapter. W. Va. Code Ann. § 17A-3-2(a) (West 2018). It is unlawful for any person *to drive or move upon any highway* any vehicle of a type required to be registered under this article which is not registered or for which a certificate of title has not been issued. W. Va. Code Ann. § 17A-3-1(a). Any person violating the provisions of this article is guilty of a misdemeanor. W. Va. Code Ann. § 17A-3-1(b).

While the statute renders the operation of the vehicle on a highway or road with an expired registration illegal, the undersigned finds that there are sufficient objective findings to provide probable cause that the traffic infraction occurred.

Firstly, Patrolman Sayre noticed that the license plate was expired based on the color of the sticker (which contains the year that the license plate expires) and the first number contained on the license plate (indicating the month that the registration expires). Second, Patrolman Sayre ran the license plate via his office's database to determine whether the license plate was expired—and it was confirmed it was. Third, the officers were familiar with the area and testified at the hearing that there was only one entrance to the Go-Mart, which lead onto a public road, on which the vehicle must have traveled to arrive at the location. Lastly, the officers both testified that the vehicle was running, indicating that its capable of moving and was likely driven to that spot. The undersigned also considers the fact that the Go-Mart is located in downtown Elkins and that the car was parked in a parking spot up front at the gas station. The vehicle was not parked in the corner of a parking lot, seemingly broken down, or located on a private residential property. Accordingly, while the undersigned considered Defendant's argument that officers did not witness the traffic infraction occur, probable cause existed that a traffic infraction did occurred and the stop was justified at the initiation.

17

### iii.  The traffic stop was sufficiently limited in scope and duration.

A traffic stop must also be "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." "With regard to scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." United States v. Guijon-Ortiz, 660 F.3d 757 (4th Cir. 2011). The analysis to determine whether the scope and duration of the traffic stop was sufficiently limited is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." Id. at 764. For a traffic stop to be extended beyond what is required during a routine traffic stop, there must be additional justification other than the original justification for the traffic stop. Id. Furthermore, during a traffic stop, officers may order a driver of the stopped vehicle to exit to car "without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Ohio v. Robinette, 519 U.S. 33 (1996) (citing Pennslyvania v. Mimms, 434 U.S. 106, 111 (1977).

Patrolman Sayre approached the vehicle on the driver's side to question Defendant and began by asking his name. Upon notification of the reasoning of the stop, Patrolman Sayre requested that Defendant exit the vehicle. Requesting this information is consistent with a routine traffic stop and consistent with information that would be gathered during a traffic stop for an expired registration. As Defendant was exiting the vehicle, Patrolman testified that he saw what appeared to be a smoking device and syringe. At this point, the officers had sufficient justification to extend the traffic stop beyond the traffic violation. The undersigned finds that the seizure was based on probable cause and the officers' actions while executing the traffic stop

were sufficiently limited in scope until there was sufficient justification to extend and expand the stop.

**B. August 1, 2017 Traffic Stop**

Defendant's main contention with the August 1, 2017 traffic stop concerns whether the traffic stop was impermissibly extended in order to allow time for K-9 Unit to arrive and conduct a dog sniff. For the foregoing reasons, the undersigned finds that the traffic stop was not impermissibly extended to allow a K-9 Unit to arrive at the scene and the K-9 dog sniff was permitted.

When an officer observes a traffic violation, there is "sufficient justification" to detain a vehicle for as long as needed to perform the "traditional incidents of a routine traffic stop." United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"— to address the traffic violation that warranted the stop and attend to related safety concerns." Rodriquez v. United States, 135 S. Ct. 1609, 1614 (2015) (citing Caballes, 543 U.S. at 407).

An officer's authority to detain terminates when its "no longer necessary to effectuate th[at] purpose." Rodriguez, 135 S. Ct. at 1614. The acceptable length of a routine traffic stop cannot be measured with "mathematical precision." United States v. Branch, 537 F.3d 328, 336 (2008). "[O]nce the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, [however] the driver 'must be allowed to proceed on his way.'" Id. at 336.

During a traffic stop, an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," such as a dog sniff. Id. at 1615 (citing Arizona v. Johnson, 555 U.S. 323 (2009)).  Dog sniffs may be conducted during a lawful traffic stop without implicating

the Fourth Amendment as unreasonable. <u>Illinois v. Caballes</u>, 543 U.S. 405 (2005). When conducted during a regular traffic stop for traffic infractions and lacking a close connection to roadway safety, a dog is not considered part of the traffic stop's "mission." <u>Rodriguez</u>, at 1615. Thus, a dog sniff may not prolong a traffic stop absent reasonable articulable suspicion for the dog sniff or the party's consent. <u>United States v. Williams</u>, 808 F.3d 238, 246 (4th Cir. 2015).

The purpose, or "mission," of this traffic stop was to address the alleged traffic infractions—littering and obstructed license plate. The extent of the traffic stop was to initiate the stop, gather the driver's license, registration, and proof of insurance, and then to issue a citation/ticket for the traffic infractions, if necessary. During the majority of the traffic stop, Chief Carlson and Officer Goad were attempting to confirm the existence of Defendant's valid insurance, which is required under West Virginia Code Section § 17D-2A-3.[7]

Upon notification by Defendant that he did have valid insurance but would have to contact his wife to obtain that information, Chief Carlson and Officer Goad waited to obtain that information instead of immediately writing a citation against Defendant or towing his vehicle. Following the receipt of the insurance information, which was notably for a different vehicle, Chief Carlson then verified the information using an automated number for the insurance. During the time needed to obtain verification, the K-9 Unit arrived and conducted a dog sniff, in which the dog alerted as to the presence of narcotics.

Defense Counsel questioned Officer Goad regarding his police report. The Report, as admitted in to evidence, contained an explanation, seemingly to be in chronological order, of the

---

[7] Chief Carlson and Officer Goad were permitted to inquire as to Defendant's insurance:
> At any time . . . when a vehicle is stopped by a law-enforcement officer for reasonable cause, the officer of the agency making the investigation shall inquiry of the operator of any motor vehicle involved . . . as to the existence upon the vehicle or vehicles of the evidence of insurance or other security required by the provisions of this code

W. Va. Code § 17D-2A-6.

events leading to the dog sniff. Of specific interest, paragraph six delineates the confirmation of

proof of insurance. The paragraphs states:

> This officer then returned to the patrol car and gave the information to Chief
> Carlson. While looking into the insurance on the vehicle both officers noted that
> the insurance card that was sent was for a Ford Econoline Van. The Chief then
> called the insurance company regarding coverage for the mustang. The insurance
> company advised that there was current coverage on the mustang.

Def's Ex. 6, at 1.

This paragraph is of importance in the undersigned's opinion because, based on the

Report's structure, the Report indicated that the confirmation of proof of insurance occurred well

before the K-9 Unit arrived, as explained in Paragraph 10. This would indicate that the officers

had all the information they needed and should have ended the traffic stop. During the Motion

Hearing, however, Deputy Chief Goad testified that while filling out the Report, he "got ahead of

himself" and stated that Defendant's insurance was confirmed but did not occur prior to the

arrival of the K-9 Unit. In addition, both Chief Carlson and Officer Goad testified during the

Motion Hearing and stated that Chief Carlson was in the vehicle verifying the insurance and

completing the citations for the traffic infractions when the K-9 Unit arrived.

Based upon the testimony presented during the Motion Hearing, and in consideration of

Deputy Chief Goad's Report, the undersigned finds that Chief Carlson was attempting to provide

the opportunity of Defendant to provide proof of insurance, which Defendant stated he could

provide by contacting his wife, and did not purposely slow down the performance of the traffic

stop in order for the K-9 Unit to arrive.

Defense Counsel also questioned Chief Carlson, based on the language of the West

Virginia statute prohibiting littering from a motor vehicle, whether Chief Carlson knew whether

the statute was strict liability—referring to whether Chief Carlson witnessed the occupants of the

vehicle drop, remove, somehow place the trash outside of the vehicle.[8] Defense Counsel's point that Chief Carlson only saw a piece of trash come out of the vehicle and there was no indication that said trash was purposely displaced from the vehicle by the passengers is well taken.[9] However, the officer's belief that the Defendant littered is not the only justification for conducting a traffic stop that was provided by officers so the argument does not disrupt the undersigned's determination of the validity of the traffic stop. The second reason—driving with an obstructed license plate[10] shown in Government's Exhibit 2—is a justifiable reason for the initiation of a traffic stop. Because there is a second justification that renders the initiation of a traffic stop valid, regardless of what the officer saw, there are issues with the justification behind the stop. Accordingly, the undersigned finds that the traffic stop was not unlawfully extended to allow a K-9 to arrive on scene to conduct a dog sniff and that the evidence found was lawfully obtained.

## III.    RECOMMENDATION

For the reasons set forth herein, the undersigned **RECOMMENDS** that the Defendants' Motion to Suppress (ECF No. 28) is **DENIED**.

Any party may, on or before Wednesday March 6, 2019,[11] file with the Clerk of Court written objections identifying the portions of the Report and Recommendation to which

---

[8] The West Virginia Code states:
> [I]t is unlawful for any driver or passenger of a motor vehicle or other conveyance to place, deposition, dump, throw or cause to be placed, deposited, dumped or thrown, any little from a motor vehicle or other conveyance in or upon any public or private highway, road, street or alley.

W. Va. Code § 17C-14-14.

[9] Base on the plain language of the statute, it is unclear how the phrase "*cause to be* place, deposited, dumped, or thrown" is interpreted.

[10] The West Virginia Code states:
> Every registration plate shall at all times be . . . in a place and position to be clearly visible and shall be maintained free from foreign materials and in a condition to be clearly legible.

[11] "Although parties are typically given fourteen days to respond to a Report and Recommendation, see 28 U.S.C. § 636(b)(1), this allowance is a maximum, not a minimum, time to respond, and the Court may require a response within a shorter period if exigencies of the calendar require. United States v. Barney, 568 F.2d 134, 136 (9th Cir.1978)." United States v. McDaniel, 1:16-CR-52 (ECF No. 32 at 14-15, at footnote). See also United States v.

objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to this Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon the Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 717 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208; Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of Court is DIRECTED to provide a Copy of this Report and Recommendation to counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Date: March 1, 2019

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE

---

Cunningham, 2011 WL 4808176, n. 1 (N.D. W. Va., Oct. 6, 2011); United States v. Mason, 2011 WL 128566, n. 7 (N.D.W. Va. Jan. 7, 2011). In this case, the final pretrial conference is set before the Honorable District Judge John Bailey on March 14, 2019 and Jury Selection and Trial is set for March 28, 2019.  The resulting calendar exigency thus warrants shortening the period with which to file objections to the Report and Recommendation and will be due by March 6, 2019.